Opinión disidente emitida por la
Jueza Asociada Señora Fiol Matta.
... No hay duda que los intereses propietarios de un empleado público se ven sustancialmente afectados por una destitución. El salario de un empleado público constituye, en la mayoría de las situaciones, su única fuente de ingreso. De ello de-pende para el sostenimiento, techo y sustento de su familia. La privación del ingreso del empleado público desarticula de manera significativa la estabilidad económica y emocio-nal de aquellas familias que se ven privadas de esa fuente de ingresos. (Enfasis suplido.) J.J. Alvarez Gon-zález, Derecho Constitucional de Puerto Rico y Relaciones Constitu-cionales con los Estados Unidos, Bo-gotá, Ed. Temis, 2009, pág. 598.
En la opinión que hoy se certifica, la mayoría del Tribunal se esfuerza en elaborar un razonamiento jurídico ló-gico, capaz de sostener la constitucionalidad de la Ley Núm. 7 de 9 de marzo de 2009, según enmendada.(1) Sin embargo, su metodología, hermenéutica y premisas consti-tucionales son, según mi criterio, totalmente inaceptables y el resultado de su esfuerzo es un edificio defectuoso en sus cimientos, tan frágil como un castillo de naipes.
La mayoría ha decidido abordar el asunto de la consti-tucionalidad del Capítulo III de la Ley Núm. 7 de 2009, consolidando casos disímiles y certificándolos prematura-mente para apresurarse a resolver el asunto constitu-cional. Sin tener prueba en el expediente, se ha inclinado *112 por afectar los puestos de trabajo de los empleados públi-cos, que constituyen un derecho adquirido y constitucional-mente protegido. Esto lo hace fundamentándose exclusiva-mente en la exposición de motivos de la ley o, lo que es lo mismo, en las alegaciones del Estado. Tal actuación pro-voca que este Tribunal no cumpla, en este caso, con su función judicial constitucional de adjudicar controversias de forma mesurada y con justificación jurídica.
La mayoría se equivoca. El Capítulo III de la Ley Núm. 7 de 2009 es inconstitucional, no tan sólo en su faz, sino también en su aplicación. Viola la cláusula constitucional de debido proceso de ley y la del menoscabo de obligaciones contractuales. En definitiva, no sólo afecta el derecho ad-quirido a su puesto que tienen los empleados públicos, sino que da al traste con nuestra legislación laboral y medio siglo de interpretación constitucional. Por eso, respetuosa-mente, disiento.
rH

Errores de método en la adjudicación

La génesis del problema fue la decisión de certificar es-tos casos, antes de que se recibiera prueba o se desarrolla-ran las teorías de las partes a nivel de primera instancia. El Artículo 69 de la Ley Núm. 7 de 2009 pretende obligar a este foro a sustraer de los Tribunales de Primera Instancia o del Tribunal Apelativo cualquier caso en el que se cues-tione la constitucionalidad de este estatuto, sin importar la etapa en que se encuentre, con la mera presentación de una solicitud a esos efectos por una de las partes.(2) La *113 mayoría del Tribunal parece haber entendido que con ello se impide o anula el ejercicio de nuestra discreción para evaluar la solicitud. La realidad es que este precepto afecta el balance de poderes e incide en nuestra función judicial y, por esa razón, no lo podemos interpretar abstrayéndonos de la naturaleza discrecional del recurso de certificación. Al sopesar si se expide un recurso de esta índole es necesario que se considere la complejidad de la controversia, su ur-gencia, la necesidad de recibir y dirimir la prueba y la etapa procesal en la cual se encuentra el caso.(3)
Igualmente, antes de tomar la determinación de conso-lidar varios casos, se debe evaluar si los hechos de los casos y las controversias, que requieren adjudicación, son comunes.(4) La opinión no indica si estos factores fueron ponderados antes de consolidarse los casos que tenemos ante nuestra consideración, lo cual hubiéramos esperado, máxime cuando en dos de los casos consolidados (CT-2009-5 y CT-2009-6), ya se habían emitido sendas resolu-ciones para denegar su consolidación. Incluso, estos casos estaban asignados a distintos jueces y no consta cuándo se tomó, ni quién tomó, la decisión de consolidarlos y asignar-los todos al Juez ponente, el compañero Juez Asociado Se-ñor Kolthoff Caraballo. (5) La consolidación tan acciden-tada, por así decirlo, de estos casos es el segundo factor que provoca que el método y los fundamentos de Derecho de la opinión mayoritaria resulten inconsistentes e ilógicos.(6)
*114 Un análisis somero de los expedientes de los recursos consolidados nos permite percibir que las controversias que se presentan no tan sólo son complejas, sino múltiples y diversas. Entre éstas, en algunos casos se alega discri-men por afiliación política, en otros discrimen por embarazo. También hay alegaciones de discrimen por ra-zón de edad, incumplimiento en la aplicación de la ley res-pecto a la antigüedad y al principio de mérito, así como alegaciones de exclusión de la aplicación de la ley, funda-mentadas en el Artículo 37.02, entre otros. Además, se ar-gumenta la inconstitucionalidad de la Ley Núm. 7 de 2009 por la violación del debido proceso de ley en su vertiente procesal y sustantiva, el menoscabo de las obligaciones contractuales y la delegación inconstitucional de los pode-res por parte de la Asamblea Legislativa al Poder Ejecutivo.
Cada uno de estos asuntos pudo requerir la intervención inicial del foro administrativo o del Tribunal de Primera Instancia para dirimir la prueba y crear un expediente que permitiera la labor efectiva de los foros apelativos, inclu-yendo la de este Tribunal Supremo. Es axiomático que el Derecho no se aplica en el vacío, requiere de hechos que sirvan de base para aplicar las normas. Sobre el particular, el autor Casimiro A. Várela advierte sobre lo siguiente:
... [L]os fallos judiciales no deben autosustentarse ...no basta que un fallo tenga fundamentos, es menester que éstos estén a su vez fundados.
*115 [E]l correspondiente al derecho y el que requieran las cir-cunstancias comprobadas de la causa.(7) (Enfasis suplido.)
En esa misma línea de análisis, Várela explica que la ausencia de prueba, en la cual fundamentar un fallo,
... puede dar lugar también al fundamento aparente de hecho o de derecho.
En tales casos ... los jueces se consideraron dispensados de fundar razonablemente su decisión, sustituyendo las razones por afirmaciones dogmáticas o fundamentos sólo aparentes. (Énfasis suplido.)(8)

A pesar de todas estas consideraciones, estos recursos se certificaron de forma apresurada y a destiempo. Ello pro-vocó que: (1) no se le proveyera a las partes un foro en el cual se plantearan y se pudieran dirimir sus discrepancias relacionadas a la prueba; (2) los expedientes con los que debíamos trabajar en esta etapa apelativa carecieran de prueba y determinaciones de hechos; (3) la determinación de este Tribunal se basara, por lo tanto, en meras alegacio-nes, y, en resumidas cuentas, (4) este Tribunal no haya po-dido ejercer adecuadamente su función adjudicativa. En definitiva, lo anterior ha provocado que se violen los dere-chos constitucionales y laborales de estos empleados públi-cos del gobierno central.

Como lo único que hay en los expedientes de los casos es la demanda, el recurso de certificación y las mociones in-terlocutorias, la opinión mayoritaria utiliza, exclusiva-mente, el texto de la Ley Núm. 7 y, particularmente, los hechos expuestos en su exposición de motivos, para justifi-car la acción legislativa. Para efectos adjudicativos, pues, se dieron por ciertos y suficientes hechos tales como: (1) la ausencia de alternativas de acciones que pudieron haber evitado los despidos; (2) el alegado déficit estructural de $3,200 millones; (3) el plan de cesantía diseñado por la *116 Junta de Estabilización y Reconstrucción Fiscal de Puerto Rico (J.R.E.F.), según los parámetros de la Ley Núm. 7; (4) la lista por antigüedad de todos los empleados del gobierno central; (5) estudios e informes que justificaran optar por un nuevo plan de cesantías en lugar del plan que dispone la Ley Núm. 184 de 3 de agosto de 2004, según enmendada (Ley Núm. 184), 2004 (Parte 1) Leyes de Puerto Rico 1128-1209, conocida como la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico; (6) los ahorros obtenidos como resultado de los despidos, esto con relación al número y el costo de las subcontrataciones, y (7) el alegado gigantismo gubernamental. Todo ello sin posibilidad de cuestiona-miento por los que impugnaron la acción del Estado ni de ofrecer prueba en contrario. De esa forma, la certificación prematura de los recursos propició un método adjudicativo estructuralmente defectuoso. En fin, el procedimiento que se siguió para adjudicar la controversia que está ante nues-tra consideración resultó en una determinación que carece de justificación válida(9) Para el escritor C.A. Varela, esta situación es problemática porque,
... dentro de un concepto racional de la justicia, la condición que motiva la decisión ha de ser la conclusión lógica de un examen analítico de los hechos y de una apreciación crítica de los elementos de prueba.
La existencia de un método posibilita que la simple creencia subjetiva adquiera un carácter impersonal que se imponga a todos, no solamente en las cuestiones de derecho, sino también en las de hecho.(10)
Ciertamente, la clave para impartir justicia es la con-gruencia entre las normas y los principios del Derecho re-conocidos y los hechos concretos del caso. Al respecto, nos dice la tratadista M.C. Redondo:
*117 Los jueces deben resolver los conflictos mediante decisiones justificadas. Se entiende que una sentencia judicial tiene que ser una decisión fundamentada en normas generales. Esto sig-nifica que tiene que poder reconstruirse conforme a la estruc-tura de un argumento válido. Los enunciados generales de deber jurídico (normas o principios) constituyen la premisa mayor, la descripción de los hechos acaecidos constituye la premisa menor y el contenido de la decisión individual del juez configura la conclusión.(11)
Esta autora añade lo siguiente:
... [E]l argumento judicial debe apoyarse en premisas garantizadas. A su vez, esta idea constituye el corolario de un principio de racionalidad más general, según el cual toda jus-tificación tiene que estar basada en razones a su vez justifica-das .... El argumento práctico en el sentido lógico sólo sirve a un concepto formal de justificación y no garantiza que las pre-misas constituyan razones sustantivas para la acción .... Por definición, la conclusión sólo estará justificada si las premisas también lo están.(12) (Énfasis suplido y escolio omitido.)
En definitiva, todo nuestro esfuerzo analítico debe diri-girnos a cernir las premisas de nuestros razonamientos, de manera que, nutridos por el conocimiento adquirido, poda-mos honestamente descartar las que no se fundamenten en razones sustantivas. Esto no fue lo que ocurrió al confec-cionarse la opinión mayoritaria. Por el contrario, al anali-zarla a la luz de los elementos enumerados por Redondo encontramos que la opinión se equivoca al elaborar las pre-misas mayores de su razonamiento; es decir, las normas de derecho aplicables, según abundaremos más adelante, pero más peligrosamente. Se equivoca en cuanto a la función judicial se refiere, pues carece de una premisa menor vá-lida, por cuanto descansa en los hechos expuestos en la Ex-posición de Motivos de la ley que son, en fin, los hechos alegados por el Estado. La unión de ambos errores de mé- *118 todo tan sólo puede llevarnos al error en la decisión. Vea-mos algunas instancias específicas.
Primero, como ya explicamos, para determinar los he-chos relevantes, la opinión mayoritaria se sustenta exclu-sivamente en la Exposición de Motivos y acepta, sin prueba, que existe una crisis fiscal y un problema de gigan-tismo gubernamental, así como que no existe otra opción para corregir el déficit estructural del gobierno central, que no sea el despido de empleados públicos y la suspen-sión de los derechos laborales. Esto, a pesar de que existen diversos informes o documentos que cuestionan estas hipótesis. En otras palabras, la mayoría de este Tribunal no tomó en consideración posiciones distintas a la adop-tada por la Legislatura, porque no hubo oportunidad para recibir y dirimir prueba en un Foro de Primera Instancia o administrativo.
En concreto, en la parte IV(B) de su opinión, la mayoría resume y parafrasea las partes de la Exposición de Motivos de la Ley Núm. 7, que aluden a la crisis fiscal. Específica-mente, desglosa los datos sobre el alegado déficit estructu-ral en cuatro subtemas, a saber: las razones para la crisis, las consecuencias de la crisis, las alternativas ante la crisis y la solución implantada por la Asamblea Legislativa. Fi-nalmente, aplica dichos datos, cuya única fuente es la Ex-posición de Motivos, y que resultan ser también las alega-ciones del Estado, sin examinar prueba que las sustente o las contradiga. Este proceso de análisis y razonamiento le lleva a expresiones como las siguientes:
Las cesantías de los recurridos, junto a las cesantías de los demás miles de empleados, aunque lamentables, provocarán, sin duda alguna, un ahorro real y sustancial en las arcas del gobierno. (Enfasis suprimido.)(13)
Además, la ley en cuestión presenta un cuadro fiscal de un Gobierno que se encuentra al borde del caos.(14)
*119 ... Por otro lado, la eliminación por parte de la Ley Núm. 7 de todos los procesos anteriores a una cesantía que establece la Ley Núm. 184 responden a la necesidad de que el propósito de la ley se alcance de manera apremiante. Como expresa el Art. 37.04(b)(1) de la propia Ley, existe urgencia en corregir los problemas fiscales que enfrentamos. El trámite de cesan-tías que establece la Ley Núm. 184 es uno basado en el prin-cipio de méritos, el cual es incompatible con el propósito del Art. 2 de la Ley Núm. 7. (Énfasis suprimido.)(15)
... Ante el cuadro que presenta la propia ley, y nuestra obli-gación de adoptar una actitud de gran deferencia hacia la ac-tuación legislativa, debemos concluir que el Estado actuó razonablemente. (Énfasis en el original suprimido y énfasis suplido.)(16)
Por otro lado, y como también se explica en la Exposición de Motivos de la ley, el establecer medidas impositivas única-mente, tampoco es una alternativa viable. (Énfasis suplido.)(17)
Segundo, en demasiadas ocasiones la opinión recurre a generalidades para apuntalar su razonamiento. Por ejem-plo, expresiones tales como:
Nuestro país, y podríamos afirmar que el resto del mundo, vive momentos muy convulsos en el aspecto económico y financiero. (Énfasis suplido.)(18)
... Lamentablemente, tales despidos se suman a los aproxi-madamente más de 120,000 empleados en la empresa privada que en los pasados, tres años también han perdido sus empleos en nuestra Isla. (Énfasis suplido.)(19)
La Ley Núm. 7 declara reiteradamente un “estado de emer-gencia fiscal” en Puerto Rico. Esta constituye la primera vez en la historia que nuestra Asamblea Legislativa utiliza el término “estado de emergencia”, en el contexto de una situación econó-mica a nivel de todo el País. (Énfasis en el original suprimido, énfasis suplido y escolio omitido.)(20)
*120 Debo señalar que también se citan fuera de contexto unas expresiones mías en una opinión disidente en el caso Asoc. Maestros v. Depto. Educación, 171 D.P.R. 640 (2007), para sostener la conclusión de que tener un interés propie-tario en un puesto no conlleva el tener un derecho adquirido. Específicamente, se cita que “no toda situación jurídica que surge al amparo de una ley anterior es un derecho adquirido cobijado por el principio de irretroactivi-dad frente a otra ley posterior”. Id., pág. 665. La opinión pasa por alto que un interés propietario en un puesto de empleo es algo muy distinto a lo considerado en ese caso, que era una exención del pago de cargos por servicios que disfrutaban unos empleados no afiliados a una unión, al amparo de una legislación posteriormente derogada.(21)
Tercero, y más preocupante aún, la opinión mayoritaria saca fuera de contexto toda una sección de nuestra Consti-tución, al fundamentar el ejercicio del poder de razón de estado en este caso en la disposición del Artículo II, Sección 18, L.P.R.A., Tomo 1. Esta sección se refiere, concretamente, al derecho de los trabajadores a la huelga, establecer pique- *121 tes y llevar a cabo actividades concertadas y no tiene que ver con la facultad de la Asamblea Legislativa para apro-bar leyes para atender una crisis fiscal. Es con relación a la posibilidad de limitar estos derechos laborales que nuestra Constitución reconoce la facultad de la Asamblea Legisla-tiva de aprobar leyes para casos de emergencia grave. Esta sección, de la cual la opinión mayoritaria cita tan sólo la última oración, dice lo siguiente:

Sección 18: Derecho a Huelga

A fin de asegurar el derecho a organizarse y a negociar co-lectivamente, los trabajadores de empresas, negocios y patro-nos privados y de agencias o instrumentalidades del gobierno que funcionen como empresas o negocios privados tendrán, en sus relaciones directas con sus propios patronos, el derecho a la huelga, a establecer piquetes y a llevar a cabo otras activi-dades concertadas legales.
Nada de lo contenido en esta sección menoscabará la facul-tad de la Asamblea Legislativa de aprobar leyes para casos de grave emergencia cuando estén claramente en peligro la salud o la seguridad pública, o los servicios públicos esenciales.(22)
Evidentemente, la intención de los constituyentes al aprobar esta sección era, en primer lugar, reconocer el de-recho a la negociación colectiva y, en segundo lugar, reco-nocerle a la Asamblea Legislativa la facultad de aprobar las leyes que fueran necesarias para la protección de la salud, la seguridad y el bienestar público, cuando se susci-tara una emergencia producto de una huelga.(23) En espe-cífico, las situaciones de emergencias que preocupaban a los constituyentes eran la privación de alimentos, medici-nas y servicios hospitalarios adecuados, la suspensión de luz eléctrica y la transportación y otros perjuicios serios que pudieran ser consecuencia de un estado huelgario.(24)
Cuarto, la mayoría optó por atender el planteamiento constitucional de estos casos, contra los criterios de autoli- *122 mitación que el Tribunal Supremo de Estados Unidos estableció en el caso de Ashwander v. Valley Authority, 297 U.S. 288, 346 (1936), y que este Tribunal adoptó en el caso E.L.A. v. Aguayo, 80 D.P.R. 552, 566 (1958). En lo perti-nente, esta doctrina de autolimitación dispone:
... La Corte “no se anticipará a decidir una cuestión de de-recho constitucional antes de que sea necesario hacerlo”.
... La Corte “no formulará una regla de derechos constitu-cionales más amplia que la que requieran los hechos precisos a los cuales ha de aplicarse”.
... La Corte no juzgará una cuestión constitucional aunque haya sido sometida propiamente en los autos, si también se somete un fundamento de otra índole que permita disponer del caso.
Cuando se cuestiona la validez de una ley del Congreso, y aun cuando se suscite una duda seria sobre su constituciona-lidad, es un principio cardinal que esta Corte primero se ase-gurará de si existe una interpretación razonable de la ley, que le permita soslayar la cuestión constitucional. (Énfasis suprimido.(25)
Además, tanto el Tribunal Supremo federal como este Tribunal han resuelto enfáticamente que “la Corte no en-tenderá en una cuestión constitucional si los autos no son adecuados para hacer una determinación de esa índole”. (26)
Por último, la mayoría también decidió acortar el tér-mino de 30 días que provee nuestro Reglamento para que cada Juez considere de forma sosegada las opiniones circuladas. Incluso, la mayoría no permitió que los Jueces y las Juezas, que interesaran escribir opiniones propias> uti-lizaran la facultad que les provee el Reglamento de aco-gerse a un término adicional para ese propósito, (27)
*123 Discrepo de este curso de acción. Al hacerlo, no pretendo negar la importancia que tiene este recurso y la bondad para el país de que se resuelva prioritariamente. Sin embargo, precisamente por ser un caso de alto interés público que incide de manera trascendental en los derechos labo-rales y constitucionales de los empleados afectados, era ne-cesario evaluarlo con cuidado y analizarlo desde diferentes perspectivas. Hacerlo no hubiera afectado en nada la situa-ción existente, puesto que los empleados recurridos ya fue-ron despedidos de sus empleos.(28) No obstante, como la mayoría de este Tribunal decidió certificar y consolidar es-tos casos para atender el asunto constitucional, a pesar de las consideraciones que hemos expuesto y de la ausencia de prueba en el legajo, nos vemos en la obligación de dis-cutir los aspectos constitucionales de esta controversia.
H-f HH

Ley Núm. 7 de 9 de marzo de 2009, inconstitucional en su aplicación

A. El interés propietario es una forma de derecho adquirido
Los empleados públicos de carrera del gobierno central tienen un interés propietario sobre su puesto, como resul-tado de las diversas leyes que la Asamblea Legislativa ha aprobado para regir el sistema de administración de recur- *124 sos humanos de Puerto Rico.(29) Usualmente, los trabajado-res adquieren este interés propietario cuando cumplen con el principio de mérito al momento de su reclutamiento; es decir, al ser elegidos como las personas más idóneas para el puesto y cuando una vez reclutados, concluyen favorable-mente el periodo probatorio.(30)
Una vez el empleado público de carrera obtiene un inte-rés propietario sobre su puesto “goza de seguridad en el empleo y sólo puede ser destituido por justa causa y previo a ciertos trámites de rigor”.(31) (Énfasis suprimido.) Por lo cual, cualquier acción gubernamental que intervenga con este interés propietario tendrá que cumplir con los pará-metros establecidos por la cláusula del debido proceso de nuestra Constitución, que tiene sus homologas en la Cons-titución de Estados Unidos.(32)
*125 Atendido lo anterior, la opinión mayoritaria plantea que “no todo derecho o interés propietario es a su vez un dere-cho adquirido”. (Enfasis suprimido.)(33) Sustenta estas ex-presiones en mi caso que es totalmente distinguible de la controversia que está ante nuestra consideración por la na-turaleza de los derechos infringidos. Me refiero al caso, ci-tado por la mayoría del Tribunal, Vélez v. Srio. de Justicia, 115 D.P.R. 533 (1984).
En ese caso, el Sr. José Vélez Reboyras tenía en el pueblo de Utuado un negocio dedicado exclusivamente a las máquinas electrónicas de vídeo-juegos. La Asamblea Legis-lativa aprobó la Ley Núm. 45 de 4 de junio de 1982 (Ley Núm. 45). Esta dispuso que todo establecimiento que se dedicara exclusivamente a las máquinas electrónicas de juegos o máquinas de “pin ball” tendría que ubicarse a dos-cientos metros de distancia de las escuelas públicas o privadas. También, dispuso que aquellos negocios de esta naturaleza que ya estuvieran ubicados a menos de doscien-tos metros de las escuelas tendrían que mantenerse cerra-dos durante el horario escolar. El propósito de la medida era velar por la seguridad y el aprovechamiento académico de los niños y jóvenes.
Al evaluar la controversia, este Tribunal determinó que la nueva ley no le quitaba al señor Vélez Reboyras su inte-rés propietario o derecho adquirido sobre la propiedad, sino que sólo se le limitaba el horario en el cual podía ope-rar su negocio. Además, la opinión hizo énfasis en que, antes de la aprobación de la Ley Núm. 45, no existía legisla-ción específica que confiriera el “derecho” a operar ilimitadamente un establecimiento dedicado exclusiva-mente a la operación de máquinas de “pin balls”.
Este Tribunal reiteró recientemente que un “ ‘derecho adquirido ... es una situación consumada, en la que las partes afectadas descansaron en el estado de derecho que *126 regía al amparo de la ley anterior’ (Énfasis supri-mido.(34) Como señala Albaladejo, no se trata de “meras facultades, expectativas, intereses o esperanzas”.(35) Tam-poco son facultades que la legislación anterior consentía que fueran ejercidas por los ciudadanos, porque éstas pue-den ser alteradas o cambiadas por la legislación posterior.(36)
El término jurídico “derecho adquirido”, según definido por el tratadista Suárez Collía, significa
... aquellos que son consecuencia de un hecho idóneo, al pro-ducirlos en virtud de la ley vigente en el tiempo en que el hecho ha sido realizado, y que se han incorporado al patrimonio de la persona aun cuando la ocasión de ejercerlos se presente úni-camente bajo la ley nueva. (Énfasis suplido.)(37)
Más concretamente, el autor Santos Briz explica cuáles actos o negocios jurídicos originan un derecho adquirido. Al respecto, expone que
... para que pueda hablarse de derechos adquiridos propia-mente tales es necesario que se trate de situaciones subjeti-vas, cuya extensión y alcance son determinados por un acto o negocio jurídico, no directamente por la ley, que se limita a hacer posible la conclusión de ese acto o negocio (un contrato, por ejemplo). Este negocio singular o individual no puede ser afectado por la norma posterior. En cambio, las situaciones jurídicas objetivas (por ejemplo, el régimen de la propiedad) pueden ser modificadas por leyes posteriores.(38)
*127 Además, este tratadista enfatiza en que una vez se ad-quiere un derecho, éste no se pierde nunca. Tan sólo pue-den ser sometidos a la nueva ley “los poderes y facultades que de él dimanen, así como la forma y modo de su ejercicio”.(39) Eso, y no la supuesta distinción entre interés propietario y derecho adquirido, fue lo que sucedió en Vélez v. Srio. de Justicia, supra.
En el caso particular de los empleados públicos de ca-rrera, su interés propietario sobre su puesto fue concedido, en principio, por alguna ley de personal del servicio público vigente al momento de comenzar a laborar para el Gobierno. Sin embargo, este interés propietario fue concre-tado mediante un contrato de trabajo individual cuando el empleado cumplió con el principio de mérito y terminó el periodo probatorio, porque mía vez el empleado cumple con estos dos requisitos se convierte en un trabajador de ca-rrera regular en el servicio público. Es en ese momento que toda la legislación laboral, reglamentos y manuales se ha-cen parte del contrato de trabajo que es el negocio jurídico existente entre el Estado, que es el patrono, y el empleado.
Como el interés propietario que un trabajador de ca-rrera regular tiene en su puesto surge de una ley que forma parte del contrato laboral, puede establecerse que dicho interés cumple con los requisitos necesarios para ser un derecho adquirido. En efecto, el interés propietario sobre el puesto es una modalidad del derecho adquirido.(40) El profesor Miguel Velázquez, citado a otros efectos en la opi-nión mayoritaria, expone este principio de la siguiente ma-nera:
En términos generales, la diferencia entre el empleado de *128 carrera y el de confianza es que el primero tiene un derecho adquirido. Es decir, un interés propietario en el desempeño per-manente de su cargo. No se le puede despedir, excepto por las causas señaladas por ley, y luego de probarse cargos en su contra. (Énfasis suplido.)(41)
A pesar de todas estas consideraciones jurídicas, la ma-yoría se ha mantenido en la posición de que el interés pro-pietario al puesto que tienen los empleados de carrera no es un derecho adquirido. Esta interpretación se da de bru-ces con lo resuelto por este tribunal en el caso Hernández, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009). En esa oca-sión, se estableció que el derecho adquirido de los ex gober-nadores Hernández Colón y Romero Barceló a tener escol-tas de forma vitalicia se produjo porque la interpretación que durante años hizo la Policía de Puerto Rico del Art. 3 de la Ley Núm. 77 de 22 de junio de 1956 (25 L.P.R.A. ant. sec. 221b), conocida como Ley de la Policía de Puerto Rico, fue avalada por la Legislatura al ésta no enmendar dicho precepto en forma material. Para sostener ese resultado, la mayoría distinguió entre una expectativa y un derecho adquirido. La primera es una facultad que no fue ejercida antes de que se enmendara o derogara la legislación; es más bien una esperanza o probabilidad que puede modificarse. Sin embargo, el derecho adquirido es aquella facultad que se ejerció antes del cambio de estatuto y a través de ese ejercicio se convirtió en un derecho que se incorporó en el patrimonio del titular, por lo cual está pro-tegido constitucionalmente de cualquier acción guberna-mental, incluso las órdenes ejecutivas.
Argumenta entonces la opinión mayoritaria que como el derecho del empleado sobre su puesto está sujeto a la po-sibilidad de ser cesanteado, “si se dan unas condiciones y *129 se cumple con unos procesos”, no se trata de un derecho adquirido. Este argumento no tiene fundamento jurídico alguno. Es más, contradice todo lo que hemos explicado sobre la figura del derecho adquirido. ¿ Cómo es posible que de la interpretación de un artículo de la Ley de la Policía de Puerto Rico surja un derecho adquirido a escoltas, mien-tras que, ante la existencia de toda nuestra legislación la-boral y el contrato de trabajo individual, se argumenta que sólo surge un interés propietario, pero no un derecho adqui-rido? Hemos explicado que una ley puede limitar la forma y el modo del ejercicio de un derecho adquirido. Lo que no permite nuestro ordenamiento jurídico es eliminarlo sin un debido proceso de ley. Por consiguiente, el fundamento de la mayoría es equivocado y los empleados públicos de ca-rrera poseen un derecho adquirido sobre sus puestos.
El cuestionamiento que resta por dilucidar es si la Ley Núm. 7, que resulta ser una ley posterior a la legislación laboral y a los contratos de trabajo individual y colectivo, puede aplicarse en forma retroactiva para socavar el dere-cho adquirido que los empleados de carrera tienen en su puesto.
Como regla general, en nuestro ordenamiento prevalece el principio de la irretroactividad de las leyes. Este es de origen civilista y se rige por los parámetros siguientes:

Las leyes no tendrán efecto retroactivo, si no dispusieren ex-presamente lo contrario.

En ningún caso podrá el efecto retroactivo de una ley perju-dicar los derechos adquiridos al amparo de una legislación anterior. (Enfasis suplido.)(42)
Según Suárez Collía, la retroactividad implica la “apli-cación de la norma jurídica a supuestos de hechos, actos, relaciones jurídicas, y/o situaciones constituidas con ante-rioridad al inicio de su vigencia formal”. (Escolio *130 omitido. )(43) La finalidad de este principio es proveer, pri-mero, seguridad jurídica y confianza en la efectividad de las leyes vigentes y,(44) segundo, reconocer una justificación de moral humana fundamentada en los principios de la libertad individual que garantizan a los ciudadanos el po-der actuar sin obstáculos en el margen de la ley.(45) Por último, el principio de la irretroactividad de las leyes res-ponde a la psicología colectiva que proclama que las leyes deben mirar al porvenir y no al pasado.(46)
A pesar de lo señalado, esta regla de irretroactividad no es absoluta.(47) Así se puede percibir del propio precepto, cuando dispone que, para que una legislación posterior aplique retroactivamente, el legislador tiene que haberlo establecido expresamente en su texto. No obstante, ade-más de la excepción que provee la cláusula, se ha estable-cido que la retroactividad de una ley también puede surgir de forma implícita, a través del estudio de la intención legislativa.(48) Claro está, siempre que esta intención surja en forma clara y definitiva del texto y el historial legisla-tivo del estatuto.(49)
Sin embargo, una limitación específica y significativa al efecto retroactivo de una ley, se origine éste de manera expresa o tácita, es que la retroactividad no podrá afectar los derechos que las partes adquirieron como resultado de un estatuto anterior. (50) En otras palabras, ante un derecho *131 adquirido no puede activarse la excepción de la retroactivi-dad de las leyes.

Como se ha establecido que los empleados tienen un de-recho adquirido sobre su puesto, la Ley Núm. 7 no puede aplicarse en forma retroactiva. Sus efectos sólo pueden ser prospectivos. Resolver lo contrario sería eliminar súbita-mente todos los derechos adquiridos que los empleados pú-blicos de carrera han obtenido mediante la ley, el contrato de trabajo individual y los convenios colectivos.

B. Menoscabo de obligaciones contractuales
Nuestra ley suprema contiene una cláusula que limita la facultad de la Asamblea Legislativa para aprobar esta-tutos que menoscaben las obligaciones contractuales existentes. El texto de ese precepto dispone que “no se aprobarán leyes que menoscaben las obligaciones contractuales”.(51) También, la Constitución de Estados Unidos contiene una disposición análoga que establece lo siguiente: “No state shall ... pass any ... law impairing the obligations of contracts.”(52)
El origen de nuestra cláusula fue el Art. 2 de la Ley Jones de 1917, específicamente sus párrafos primero y quinto.(53) Se decidió incorporar a nuestra Constitución esta norma, sin enmiendas, porque los asesores de la Con-vención Constituyente lo recomendaron para evitar que se originaran malas interpretaciones que perjudicaran “las medidas encaminadas a traer inversiones y fomentar la producción en todos sus aspectos”.(54)
El propósito de esta disposición es asegurar la estabili-dad en las relaciones contractuales, porque se consideran un valor social importante que requiere la protección de *132 nuestro ordenamiento. Menoscabar las obligaciones con-tractuales implicaría modificar las consecuencias legales de lo pactado, en perjuicio de una de las partes contratantes. En otras palabras, no existiría certeza de lo pactado, ni habría fundamento racional para los actos o negocios jurídicos. Tal situación, provocada por la acción legislativa, resultaría en la desconfianza de las partes con-tratantes y en la desestabilización de la sociedad.(55)
Sin embargo, este principio de protección de las obliga-ciones contractuales no es absoluto, porque tiene que ser balanceado con el poder de reglamentación del Estado.(56) Es decir, debe existir una relación consistente entre la bús-queda de certeza en las contrataciones que persigue la li-mitación constitucional y la excepción a la norma, funda-mentada en el poder que tiene el Estado para reglamentar medidas que salvaguarden el bienestar de la sociedad.(57) De lo contrario, se perdería el objetivo de las garantías constitucionales de proteger al ciudadano contra las actua-ciones arbitrarias e irrazonables sostenidas mediante el palio del poder soberano del Estado.
Es imperativo reconocer que no todo menoscabo contractual viola la garantía constitucional.(58) Al analizar si un *133 estatuto viola la cláusula de menoscabo de las obligaciones contractuales es necesario referirnos a la interpretación que el Tribunal Supremo de Estados Unidos ha realizado de este precepto, puesto que ésta representa el mínimo de protección que nuestro ordenamiento le puede proveer a los ciudadanos.(59) Claro está, siempre considerando que "nuestra Constitución tiene una factura más ancha que la Constitución federal con respecto a derechos tales como la prohibición del menoscabo de obligaciones contractuales”. (Enfasis suprimido.)(60)
La jurisprudencia ha elaborado un análisis para deter-minar si una legislación es inconstitucional, a la luz de la cláusula de menoscabo de las obligaciones contractuales. El primer paso en este análisis conlleva identificar el tipo de relación contractual afectado, en términos de si el con-trato es estrictamente entre partes privadas o si el Estado es una de las partes contratantes.(61) El segundo paso es evaluar si la modificación que la medida legislativa pro-vocó en el contrato es sustancial o severa.(62)
En el caso de los contratos privados, el tercer paso re-quiere examinar si el interés que persigue el gobierno con el estatuto es legítimo, como lo sería si la medida tuviera la finalidad de resolver un problema económico o social general.(63) Finalmente, se utiliza un criterio de razonabi-lidad para evaluar si existe una relación razonable entre el interés del Estado y el medio seleccionado para lograrlo. Se trata de “ ‘un balance razonable entre el interés social de promover el bien común y el interés, también social, de proteger las transacciones contractuales contra la aplica- *134 ción arbitraria e irrazonable de las leyes’ ”.(64) Respecto a la evaluación de razonabilidad de una ley, el Tribunal Supremo federal le ha conferido deferencia al juicio legis-lativo.(65) Como se puede observar, el rigor analítico en los contratos privados es similar al escrutinio racional del de-bido proceso de ley e igual protección de las leyes.(66)
Sin embargo, el escrutinio adoptado por nuestra juris-prudencia, siguiendo las pautas de la jurisprudencia federal, para verificar la constitucionalidad del estatuto que modifica un contrato público, en el cual el Estado es una de las partes contratantes, es de otro tipo. En esos casos, en Estados Unidos se utiliza un criterio de análisis interme-dio que nuestra jurisprudencia ha denominado “cuida-doso”.(67) La idea es que en estos casos no es suficiente des-cansar en el criterio de la razonabilidad, pues hay que evi-tar que la actuación del Estado sea en su propio bene-ficio. (68) Una vez identificado el tipo de relación contractual como gubernamental, el segundo paso es evaluar la severi-dad del menoscabo. Cuando el daño producido por el me-noscabo de las relaciones contractuales es severo, se au-menta el nivel de escrutinio a un examen cuidadoso de la naturaleza y el propósito de la legislación estatal.(69) El tercer paso es determinar si existe un interés gubernamen-tal importante.(70) Se ha establecido que esta determina-ción no pueden tomarla los estados, porque si éstos pudie-
*135 ran justificar el menoscabo de sus obligaciones contrac-tuales a partir de su propia determinación de lo que es importante, entonces la cláusula constitucional no tendría valor alguno.(71)
A diferencia de los contratos privados, la modificación en los contratos públicos debe ser necesaria, además de razonable.(72) Para determinar la razonabilidad de una ley se considera “la sustancialidad del interés público promo-vido por el mismo y la dimensión del menoscabo ocasio-nado por su aplicación retroactiva”.(73) Un factor para de-terminar esta razonabilidad es la extensión del menoscabo y la existencia de urna emergencia declarada.(74) Por otro lado, la necesidad se establece tomando en consideración dos criterios: (1) si la medida legislativa era esencial y (2) si no existían otras alternativas menos onerosas y dañinas para lograr el objetivo del estatuto. Utilizando este análi-sis, la jurisprudencia federal ha determinado que el Estado no puede imponer medidas drásticas cuando existe eviden-cia de otros cursos de acción más moderados y que, igual-mente, pueden satisfacer el interés del Estado. Específica-mente, en el caso medular sobre este asunto el Tribunal Supremo federal concluyó:
The determination of necessity can be considered on two levels. First, it cannot be said that total repeal of the covenant was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the covenant’s limitations on the use of Port Authority revenues and reserves to subsidize commuter railroads. Second, without modifying the covenant at all, the States could have adopted alternative means of achieving their twin goals of discouraging automobile use and improving mass transit. Appe-llees contend, however [sic], that choosing among these alternatives is a matter for legislative discretion. But a State is not completely free to consider impairing the obligations of its own *136 contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well. (Énfasis suplido.)(75)
También ha señalado el Tribunal Supremo federal que, a diferencia del menoscabo de los contratos privados, cuando se quebranta un acuerdo público no se otorga com-pleta deferencia al análisis de razonabilidad y necesidad que pueda haber realizado la Legislatura. La razón es evi-dente: existe un conflicto de interés, pues si se otorga defe-rencia a la Legislatura en este contexto el Estado termina-ría siendo juez y parte. (76)
A pesar de esta clara directriz del más Alto Foro federal, la opinión mayoritaria trata de justificar lo contrario, fun-damentándose en jurisprudencia de los tribunales federa-les apelativos. Esto, sin duda, es un error metodológico, porque las decisiones de esos tribunales son meramente persuasivas, mientras que las interpretaciones de la Cons-titución federal que hace el Tribunal Supremo de Estados Unidos nos obligan.
Además, las decisiones de los tribunales federales de circuito que utiliza la mayoría no sostienen sus conclusiones. Estos casos afirman que se le debe conceder al Estado “alguna deferencia”, mientras la opinión mayori-taria le concede una deferencia completa y obvia total-mente el posible conflicto de interés. Ya explicamos que la opinión de este Tribunal fundamenta su determinación, ex-clusivamente, en la Exposición de Motivos de la Ley Núm. 7 sin que haya en el expediente alguna evidencia que pruebe lo contenido en ésta. Este Tribunal ha tenido oca-sión de expresarse anteriormente sobre esto:
Nos merecen profundo respeto las declaraciones legislativas sobre los males sociales que el legislador intenta remediar. *137 Pero tales expresiones deben estar fundadas en hechos de cono-cimiento general y no constituir un mero fíat legislativo. (En-fasis suplido.)(77)
Ciertamente, el Estado debe tener la libertad para ejer-cer su poder de reglamentación y de esta forma, proteger los intereses de los ciudadanos y salvaguardar el bien común. Dicho poder, sin embargo, no es absoluto. Tampoco puede ser arbitrario ni irrazonable. La cláusula del menos-cabo de las obligaciones contractuales limita ese legítimo ejercicio del Poder Legislativo, especialmente en los contra-tos públicos. El poder inherente del Estado de proteger el bienestar público le permite al gobierno quebrantar una obligación contractual pública, siempre y cuando no la des-truya o la afecte de forma severa.(78) Cuando esto último ocurre, y no se pueda establecer la razonabilidad y necesi-dad del estatuto, la limitación constitucional de la cláusula de menoscabo de obligaciones contractuales puede superar la facultad de legislar que tiene la Asamblea Legislativa, irrespectivamente de que se persiga proteger un interés público que el Estado ha determinado importante.(79)
Una de las controversias planteadas ante este Tribunal es que la Ley Núm. 7 es inconstitucional, porque viola la cláusula de menoscabo de las obligaciones contractuales. De entrada hay que establecer que el escrutinio que se debe utilizar para evaluar este planteamiento es el más cuidadoso, porque se trata de contratos donde el gobierno es parte. Contrario a la mayoría, que evalúa esta controver-sia desde la óptica de los contratos colectivos, es decir, los convenios, entiendo que el análisis sobre el menoscabo debe incluir, también, a los contratos individuales.
*138 Sin duda, existe una obligación contractual entre las res-pectivas agencias del gobierno central y sus empleados. Sólo es necesario repasar la definición de “contrato de tra-bajo” para llegar a esta conclusión. Así lo expone Caballe-nas de Torres al referirse al contrato de trabajo como aquel “que tiene por objeto la prestación continuada de servicios privados y con carácter económico, y por el cual una de las partes —el patrono, empresario o empleador— da remune-ración o compensa a cambio de disfrutar o servirse, bajo su dependencia o dirección, de la actividad profesional de otra, denominada el trabajador”.(80) También hay un con-trato público entre las agencias y los sindicatos que repre-sentan a los trabajadores. En ambos casos existen contra-tos firmados, ya sean individuales o colectivos, donde se establecen las condiciones de trabajo, los salarios y los de-rechos y las obligaciones de cada parte. Antes de la apro-bación de la Ley Núm. 7 estos contratos estaban cobijados por las leyes de personal del servicio público, Ley Núm. 184 y la Ley de Relaciones del Trabajo, Ley Núm. 45, entre otra legislación laboral del país.
En el caso de los contratos individuales de trabajo, el menoscabo que provocó la Ley Núm. 7 fue severo. En con-creto, esta legislación terminó totalmente y por tiempo in-definido la obligación contractual existente con los empleados. Como resultado de las cesantías masivas, miles de empleados se quedaron sin sus empleos. Además, la ley limitó a la jurisdicción apelativa de la Comisión de Apela-ciones para el Sistema de Administración de Recursos Hu-manos (CASARH), de manera que ésta sólo pudiera revisar casos que plantearan asuntos de antigüedad. (81) Más con-cretamente, se dejó inoperante el principio de mérito y se *139 afectó el funcionamiento del Sistema de Administración de Personal del Servicio Público.(82)
Respecto al menoscabo que causa esta legislación en los convenios colectivos, se puede establecer que también es se-vero porque(83) (1) afecta la integridad del convenio colec-tivo; (2) limita los mecanismos para proteger a los miem-bros y solucionar las controversias, de manera que se pueda proveer la justa representación a la que están obli-gados los sindicatos; (3) no se reconoce lo que está nego-ciado colectivamente; (4) no se puede negociar colectiva-mente; (5) no se puede organizar sindicalmente;(84) (6) la jurisdicción de los foros administrativos encargados de tra-mitar las querellas de los trabajadores se limita a resolver controversias de antigüedad;(85) se limita el alcance de la Ley de Relaciones del Trabajo para el Sector Público, Ley Núm. 45, lo que afecta el Sistema de Relaciones Laborales en el Gobierno Central; (8) suspende los controles legales y normativos sobre las cesantías que establece la Ley Núm. *140 184 y se sustituye por el desarrollado en la Ley Núm. 7(86) y (9) permite y promueve que se alteren las condiciones de empleo y los beneficios económicos sin negociar, incluyendo el traslado de los empleados y la subcontratación de los servicios.(87)
La administración gubernamental ha justificado la aprobación de la Ley Núm. 7, que incluye medidas tan drásticas como el despido masivo de empleados públicos con contratos vigentes, fundamentándose en que la econo-mía de Puerto Rico atraviesa una grave crisis fiscal. Según la administración existe un déficit estructural recurrente de $3,200 millones en las finanzas del Gobierno, que no le permite cubrir sus gastos operacionales y que, a su vez, mantiene el crédito de Puerto Rico en condición de chatarra.(88) Ante ese panorama, el Gobierno optó por apro-bar un plan de estabilización, la denominada Ley Núm. 7, en el cual se incorporan y justifican medidas de ingresos y mejor fiscalización, control y reducción de gastos y otros mecanismos fiscales.
El interés del Gobierno en restablecer las finanzas es importante, porque posibilita proveer los servicios públicos necesarios a toda la sociedad. Sin embargo, al aplicar el análisis que nuestra jurisprudencia ha denominado “cuida-doso”, no podemos menos que cuestionar la razonabilidad de la medida de despidos masivos adoptada por la ley. Salta a la vista que el Estado no ha probado la situación de emergencia, en la cual sustenta la aprobación de la Ley Núm. 7, más allá de la información que se incluye en su Exposición de Motivos, y no se ha permitido la presentación de prueba en contrario. Segundo, tampoco es razonable que la alegada crisis fiscal se trate de atender en el corto pe-ríodo de un año. Tercero, no es razonable pensar que, en términos de los cesanteados, el daño no es permanente, *141 cuando también se alega y hay estudios que recomiendan otras opciones más moderadas.(89)
A pesar de lo señalado, la mayoría pretende justificar el despido masivo de empleados públicos y la duración del impacto de la Ley Núm. 7, aludiendo a casos del segundo y cuarto circuito federal que resultan ser poco persuasivos, porque atienden hechos distintos a los que suscitan esta controversia. Primero, en el caso Buffalo Teachers Federation v. Tobe, 464 F.3d 362 (2do Cir. 2006), la emergencia fiscal de la ciudad fue atendida, congelando puestos y no concediendo aumentos. Esto significa que no se modificó severamente y, ciertamente, no se eliminó del todo, la re-lación contractual existente entre los empleados públicos y el patrono. Los salarios de los trabajadores no se afectaron con las medidas fiscales. Tampoco se quedaron sin trabajo, o sea, sin su único medio de subsistencia. Además, las ac-ciones tomadas fueron temporeras y prospectivas.(90)
El otro caso que cita la mayoría para validar su aprecia-ción de que la Ley Núm. 7 es razonable, es el caso Baltimore Tchrs. UN. v. Mayor, etc., of Baltimore, 6 F.3d 1012 (4to Cir. 1993). La controversia que resuelve el tribunal apelativo del 4to Circuito también es distinta a nuestro caso. En Baltimore el déficit fiscal de la ciudad se enfrentó reduciendo en 1% el salario de policías y maestros. El re-sultado de esta acción administrativa fue reducir la jor-nada laboral en 2.5 días. Claramente, esta actuación es menos onerosa que la que tomó el Gobierno de Puerto Rico. *142 En su ponderación de los hechos, el tribunal del circuito apelativo tuvo ante su consideración un expediente con prueba suficiente para poder evaluar la correlación de la razonabilidad entre las medidas tomadas y la necesidad fiscal. Esto para efecto de determinar si hubo una violación a la cláusula de menoscabo de las obligaciones contractuales. Concretamente, el tribunal apelativo ex-presó:
Nor ... can we conclude that the City chose a drastic impairment over an equally acceptable, more moderate course. First, the amount of the reduction was no greater than that necessary to meet the anticipated shortfall. Second, the city discontinued the plan immediately upon recognition that the budgetary shortfall would not be so great as anticipated. Finally, the plan did not alter pay-dependent benefits, overtime pay, hourly rates of pay, or the orientation of pay scales. Indeed, the plan was less drastic than at least one alternative, additional layoffs, which could have been more detrimental to appellees. In short, the City clearly sought to tailor the plan as narrowly as possible to meet its unforeseen shortfalls. (Citas omitidas.)(91)
Al aplicar los criterios del escrutinio “cuidadoso” o inter-medio, que es el correcto en este caso, es evidente que, en efecto, la Ley Núm. 7 menoscabó los contratos individuales de los trabajadores y los convenios colectivos acordados con el representante exclusivo. Este estatuto suspendió todo el sistema de administración de personal del servicio público, que establece la Ley Núm. 184 y sus predecesoras, y la normativa de relaciones laborales del sector público, cobi-jada por la Ley Núm. 45.
No se puede llegar a otra determinación, porque el Es-tado no evidenció la existencia de la crisis ni la razonabili-dad de la medida, a pesar de que la mayoría trata de ha-cerlo a través de su extensa referencia a la exposición de motivos. Tampoco el Gobierno validó la necesidad de la me- *143 dida con relación a otras opciones menos drásticas. En fin, todo esto es la consecuencia inevitable y directa de certificar los casos sin que se hubiera presentado prueba ante el tribunal de instancia, o los foros administrativos, para sus-tentar las alegaciones de las partes.
C. Bebido proceso de la ley procesal
Como quedó establecido en la parte 111(A) de esta opi-nión, los empleados regulares de carrera del sector público tienen un interés propietario, es decir, un derecho adqui-rido, sobre sus puestos. Ante ese hecho, y ante la acción del ente gubernamental para afectar ese derecho propietario, se activa la cláusula del debido proceso de ley. Concreta-mente, este Tribunal ha establecido que “[e]l debido pro-ceso de ley procesal tiene vigencia en las situaciones en que el empleado goza de un interés propietario o tiene una expectativa razonable de titularidad de propiedad”. (92) Por lo tanto, visualizando la cesantía como una modalidad de despido, si a un empleado se le deja cesante sin dársele la oportunidad de ser oído, se le viola el derecho a un debido proceso de ley.(93)
Esta garantía a un debido proceso de ley cuando se priva a una persona de su propiedad o libertad, está in-cluida en la Carta de Derechos de nuestra Constitución y es parte integral de nuestro sistema de gobierno. Al res-pecto, el precepto constitucional establece:
Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. No existirá la pena de muerte. Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. No se aprobarán leyes que menoscaben las obligacio-nes contractuales. Las leyes determinarán un mínimo de pro- *144 piedad y pertenencias no sujetas a embargo. (Énfasis suplido.)(94)
Esta cláusula incluye el principio más importante del derecho constitucional norteamericano, un principio que ha formado parte de la historia del derecho humano desde su incorporación inicial en la Magna Carta. Su objetivo, desde siempre, ha sido velar porque se respeten los proce-dimientos y se provean las “garantías básicas de los dere-chos personales en su forma más amplia y general”. (95) En fin, esta norma constitucional simboliza la esencia de nuestro sistema de justicia y refleja nuestra vida en socie-dad y el grado de civilización alcanzado.(96)
La garantía constitucional a un debido proceso de ley tiene dos consideraciones en su análisis y en su aplicación. Éstas se han caracterizado como dos vertientes, por un lado, la procesal y, por el otro, la sustantiva.(97) La primera tiene la finalidad de garantizar un proceso justo y equita-tivo ante acciones estatales que interfieran con intereses privados. Es decir, se refiere a las “pautas procesales que la entidad pública debe reconocer a las personas, indepen-dientemente de si por ley o reglamento esas pautas se reconocen”.(98) Mientras, la segunda se refiere a la validez de las leyes que implementa el Estado en cuanto a su pro-tección de los derechos de los ciudadanos.(99) Esto significa que el Estado no puede afectar arbitraria, irrazonable o caprichosamente, mediante estatutos o actuaciones admi-nistrativas, los intereses de propiedad o libertad de las *145 personas.(100) Ninguna de estas modalidades de la cláusula del debido proceso de ley pueden ser invocadas si no se cumple con el requisito de acción estatal.(101)
Según la vertiente procesal del debido proceso de ley, que es la pertinente en este caso, son tres las consideracio-nes que se examinan para determinar si, en efecto, se ha violado esta cláusula constitucional. Estas pueden resu-mirse en tres interrogantes: (1) ¿qué intereses de libertad o propiedad están protegidos por el precepto?, (2) ¿en qué etapa se debe conceder el debido proceso? y (3) ¿cuáles ca-racterísticas debe tener el procedimiento que se utilice para afectar, de algún modo, ese interés, de manera que éste pueda ser el adecuado?(102) Si no se logra superar el primer cuestionamiento, entonces el Estado no tiene la obligación de garantizar el debido proceso de ley.(103)
Como regla general, el debido proceso de ley debe con-cederse antes de que la determinación administrativa sea efectiva. No obstante, hay circunstancias particulares, como las situaciones de emergencia en las que están en juego la salud y la seguridad de la comunidad, que justifi-can que la entidad gubernamental tome primero la deter-minación administrativa y conceda el debido proceso en un término razonable de tiempo.(104)
El procedimiento que debe ser concedido depende de la controversia y los hechos que la rodean, ya que el debido proceso de ley procesal no es técnico ni inflexible, sino más bien circunstancial y pragmático. Lo que se requiere, a fin *146 de cuentas, es que sea coherente con el principio de que todo proceso debe ser justo, imparcial y no arbitrario.(105) Esta ponderación se logra al sopesar tres criterios medula-res:
(1) se debe determinar cuáles son los intereses individuales afectados por la acción oficial; (2) el riesgo de una determina-ción errónea que prive a la persona del interés protegido me-diante el proceso utilizado y el valor probable de garantías adicionales o distintas, y (3) el interés gubernamental prote-gido con la acción sumaria y la posibilidad de usar métodos altemos.(106)
Es a base de estas consideraciones que este Tribunal ha reconocido unos requisitos básicos que deben formar parte del procedimiento adversativo. Estos son: (1) la notifica-ción adecuada del proceso, (2) que el proceso institucional se realice ante un adjudicador imparcial; (3) la oportuni-dad de ser oído; (4) el derecho a contrainterrogar testigos y a presentar prueba oral y escrita a su favor; (5) la asisten-cia de un abogado o una abogada; (6) que la decisión se fundamente en el expediente, y (7) que la decisión sea fun-damentada o explicada.(107)
En el área del empleo público, hemos resuelto que los trabajadores, que son destituidos de sus puestos, tienen el derecho a una vista informal antes del despido.(108) Claro está, antes de esa vista informal previa, la “autoridad no-minadora” debe enviarle al empleado una notificación donde le informe, de manera adecuada, los cargos adminis- *147 trativos y la hora, la fecha y el lugar en el cual se realizará la audiencia y le describa la prueba que tiene el patrono.(109) Sin esa notificación adecuada, la vista informal no cumple con los requisitos del debido proceso de ley.(110) Además, sin esa notificación el trabajador será des-pojado de su empleo sin estar preparado para rebatir los argumentos del patrono.
Cuando lo que ocurre es la cesantía, que no es otra cosa que una modalidad de despido, hemos determinado que, previo a esa acción, se le debe notificar al empleado el plan de cesantías e informarle el método en el que está fundamentado. Esto, antes de que sea separado de su puesto.(111) Más aún, hemos concluido que el hecho de que exista una crisis fiscal no es suficiente, por sí solo, para concluir que la cesantía se realizó siguiendo los estatutos o las normas vigentes.(112) Más concretamente, hemos expre-sado lo siguiente:
... Independientemente de cuan justificadas pudieran haber estado unas cesantías desde el punto de vista económico, la política pública a favor de la implementación del sistema de mérito exige que haya constancia de que al eliminarse uno o más puestos en una clase se dejarán cesantes y serán reteni-das las personas indicadas de acuerdo con los criterios objeti-vos que el sistema de mérito encarna. Es igualmente vital que todos los empleados públicos posean conocimiento previo del método a seguirse para que puedan defender adecuadamente sus derechos, los cuales son relativos a los derechos de los demás. La ausencia de constancia clara, objetiva y difundida de los criterios para determinar quiénes habrán de quedar ce-santes crea inseguridades y siembra dudas no sólo sobre la legitimidad de cada cesantía particular, sino sobre la validez y *148 necesidad de la decisión de decretar cesantías en general. (Én-fasis suplido.)(113)
Es cierto que esta interpretación se fundamentó, no en la Constitución, sino en las disposiciones de la Ley de Personal del Servicio Público, Ley Núm. 5, sustituida por la Ley Núm. 184. Pero es que esa ley incorporaba el debido proceso de ley constitucional, en lo que respecta a la reten-ción de los trabajadores; por eso, en aquel momento no era necesario recurrir a la Constitución para sustentar nues-tra decisión. Sin embargo, ello no significa que debamos aceptar que otro estatuto socave impunemente el debido proceso de ley constitucional, vigente en la actual Ley para la Administración de los Recursos Humanos del Estado Li-bre Asociado de Puerto Rico y contenido en los convenios colectivos, según el mandato de la Ley de Relaciones del Trabajo del Servicio Público.
La mayoría argumenta que la Ley Núm. 7 concede a los empleados cesanteados un debido proceso de ley “bastante similar al que establece la Ley Núm. 184 ...” (Enfasis su-plido.)(114) En fin, expresa la mayoría que lo que hace la Ley Núm. 7 es recoger los “procedimientos que rigen según la Ley Núm. 184, y los adapta ...”. (Énfasis suprimido.)(115) Nada más lejos de la realidad. Para confirmarlo, es sufi-ciente cuestionarnos por qué, si ambos procedimientos de retención son similares, no se utiliza el procedimiento de la Ley Núm. 184. Esta interrogante la contesta la opinión ma-yoritaria, planteando que era necesario hacer más expedito el procedimiento de despidos para “decretar cesantías me-diante un mecanismo más ágil”. (Énfasis suprimido.)(116) Sin embargo, no existe prueba en el expediente que de-muestre esta afirmación. Lo que sí ha sido evidente es que el proceso de cesantías de la Ley Núm. 7 se ha complicado *149 y alargado debido a las violaciones al debido proceso ínsi-tas en éste, derrotando la sensibilidad construida en el pro-cedimiento de retención establecido en la Ley Núm. 184, que siempre entendió las cesantías como el último recurso y no como la política pública.
¿Cómo afectaba en términos de tiempo aplicar el plan de retención contenido en la Ley Núm. 184? Este plan dispone que se podrán eliminar puestos por falta de trabajo o de fondos, sujeto a lo siguiente:
En estos casos, las cesantías se decretarán dentro de los grupos de empleados cuyos puestos tengan el mismo título de clasificación y considerando dentro de cada grupo el status de los empleados, su productividad, hábitos y actitudes reflejadas en sus evaluaciones y su antigüedad en el servicio. A los fines de determinar antigüedad, se considerará todo servicio pres-tado en puestos de las agencias comprendidas en el Sistema. La autoridad nominadora de cada agencia notificará por es-crito a todo empleado a quien haya de cesantear con no menos de treinta (30) días de antelación a la fecha en que habrá de quedar cesante. Ninguna cesantía de empleados será efectiva a menos que se cumpla con el requisito de notificación. Cada agencia procederá a establecer un procedimiento escrito a los efectos de decretar cesantías en caso de estas ser necesarias, el mismo será divulgado a [sic] estará disponible para conoci-miento de cualquier empleado interesado.

Antes de decretar la cesantía debido a la eliminación de puestos por falta de trabajo o fondos, se agotarán todos los recursos al alcance para evitar dicha cesantías con acciones tales como:

(A) Reubicación de personal en puestos de igual o similar clasificación en departamentos, oficinas o programas en que haya necesidad de personal.
(B) Readiestramiento del empleado para reubicarlo en otro puesto, cuando esto pueda hacerse razonablemente antes de la fecha límite para decretar tales cesantías.
(C) Disfrute de vacaciones acumuladas.
(D) Licencia sin sueldo hasta tanto cese la crisis presupues-taria, cuando la agencia tome la decisión por la insuficiencia presupuestaria temporera que no requiera la eliminación per-manente del puesto. En tales casos, deberá observarse el or-den de prelación previamente establecido en el método de de-cretar cesantías.
(E) Reducción en la jomada de trabajo.
*150 (F) Descenso de los empleados como último recurso para evi-tar cesantías. (Énfasis suplido.)(117)
Evidentemente, este plan no afecta el objetivo de aten-der la alegada crisis fiscal del gobierno. Al contrario, crea un procedimiento justo y fundamentado en el principio de mérito, el cual evita no tan sólo las dudas sobre la legiti-midad de las cesantías y la inseguridad en los afectados, sino también potenciales disputas legales.

El plan de cesantías según la Ley Núm. 184 proveía un debido proceso de ley constitucional, porque permitía que los empleados estuviesen informados del proceso de las ce-santías, de manera que pudieran defenderse apropiada-mente si no estaban de acuerdo con la determinación administrativa. Distintamente, el plan de retención de la Ley Núm. 7 es contrario al debido proceso de ley, porque no les provee a los empleados cesanteados la oportunidad de ser oídos ni una vista informal previa.

Respecto a la ausencia de oportunidad de ser oído, salta a la vista, como consideración inicial, que la notificación de cesantía enviada a los trabajadores fue defectuosa. Obser-vemos un modelo de las cartas en las cuales se notificó la cesantía a los trabajadores:
De conformidad con las disposiciones de la Ley Núm. 7 de 9 de marzo de 2009, conocida como “Ley Especial Declarando Emergencia Fiscal y Estableciendo Plan Integral de Estabili-zación Fiscal para Salvar el Crédito de Puerto Rico” (en ade-lante Ley 7), y al orden de antigüedad establecido por la Junta de Reestructuración y Estabilización Fiscal (JREF), le informo que efectivo el 6 de noviembre de 2009 queda cesante del puesto clasificado .... (Énfasis suplido.)(118)
Sin duda, esta notificación no informa la causa o justi-ficación de la cesantía. Sólo hace referencia a que el des-pido se fundamenta en la Ley Núm. 7 y al orden de anti-güedad diseñado por la J.R.E.F. Tampoco se describe la *151 prueba que tenía el patrono; específicamente, no se describe el plan de cesantía ni el método en el que se basó, como tampoco la antigüedad que corresponde al empleado cesan-teado con relación a otros. Es decir, en la notificación no se alude a la lista de antigüedad de todo el servicio público. Por consiguiente, los empleados que la recibieron no esta-ban en posición para defenderse e impugnar las alegacio-nes del Estado. Como hemos expresado, en dichas circuns-tancias una vista previa es fútil.
Aun cuando se incluyera como parte de la notificación adecuada la descripción de la prueba del patrono mencio-nada, la vista previa a la que se refiere la mayoría es insuficiente. Esta vista se limita a cuestionar la antigüe-dad del empleado, según lo afirma la opinión mayoritaria cuando expresa que “la controversia, por meritoria que sea, siempre será relativamente sencilla: si el empleado cuenta con la evidencia de los años trabajados”.(119) Es decir, la controversia se limita a que el empleado demuestre, por ejemplo, que en vez de doce años de servicio realmente sirvió trece años y medio. Sin embargo, el empleado no puede impugnar su cesantía con relación a la de otros em-pleados no cesanteados, ni la puede cuestionar por razón de otros asuntos, como discrimen político, embarazo o edad, entre otros. Por esto, esta vista informal previa constituye un procedimiento totalmente pro forma.
Ante este panorama, se puede afirmar que la Ley Núm. 7 viola el debido proceso de ley procesal constitucional. Li-mitada la controversia al aspecto de la antigüedad y sin que se le notificase siquiera lo pertinente a ese criterio respecto a los demás empleados, la vista informal previa era una mera formalidad. Aun conociendo que tenían fun-damentos distintos al de antigüedad para demostrar que se estaba violando la ley, para los empleados públicos el foro administrativo estaba vedado. Mayor violación al debido proceso de ley procesal constitucional no vamos a encontrar.
*152 III

Ley Núm. 7 de 9 de marzo de 2009, inconstitucional de su faz

La Constitución del Estado Libre Asociado, aprobada el 25 de julio de 1952, incluye una disposición que le prohíbe a la Asamblea Legislativa aprobar estatutos que incorpo-ren más de un asunto o que no lo expongan en el título de la medida. Sobre este particular, la Ley Suprema esta-blece:
... No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aque-lla parte de una ley cuyo asunto no haya sido expresado en el título será nula .... (Énfasis suplido.(120)
Tal limitación al proceso legislativo fue adoptada, por primera vez, en la Ley Jones de 2 de marzo de 1917 y fue mantenida por los constituyentes al aprobar nuestra constitución.(121)
Esta disposición es clara. Requiere, por un lado, que toda ley, salvo la de presupuesto, esté dirigida a un solo objetivo o asunto. Además, toda ley debe incluir en su tí-tulo el asunto o propósito que pretende atender la Asam-blea Legislativa y si se incluye alguna materia en el cuerpo de la ley, pero no en su título, esta porción de la medida será nula.
*153 Desde sus orígenes en la Ley Jones, hemos tenido varias oportunidades de interpretar este precepto. Hemos expre-sado la necesidad de que el título de una legislación refleje, en forma general, su contenido. Aclaramos que no se tiene que incluir en el título una descripción minuciosa o un ín-dice del contenido de la ley.(122) Claro está, la generalidad del título no puede inducir a error a las partes afectadas por la ley ni a los legisladores que tienen la función de evaluarla, estudiarla y aprobarla.(123) Siempre hay que ase-gurarse de que el único asunto o materia del que trate la ley aparezca claramente en su título. (124)
Este principio constitucional persigue tres propósitos principales: (1) impedir que se incluyan en el estatuto “ma-terias incongruentes y extrañas”;(125) (2) evitar “la inadver-tencia, la ocultación y el fraude en la legislación”,(126) y (3) informar a la sociedad y a los legisladores la finalidad de la medida, de manera que “el primero pueda oponerse a su aprobación si la considera lesiva a sus intereses y los se-gundos estén en condiciones de emitir su voto conscientes del asunto que es objeto de legislación”.(127) En fin, el obje-tivo es que la legislatura y el público puedan deducir que se aprobarán únicamente materias germanas a las expre- *154 sadas en el título.(128) Todas estas consideraciones fueron analizadas y dilucidadas por los constituyentes.(129)
En este momento, la pregunta obligada es, si el título de la Ley Núm. 7 cumple con los requisitos que establece nuestra Constitución. Veamos.
Una somera lectura de la Ley Núm. 7, confirma que ésta regula más de un asunto. Este estatuto impone nue-vos arbitrios, como en el caso de las motocicletas y au-menta otros, como el de los cigarrillos y las bebidas alcohólicas. Además, permite que la Autoridad de Edificios Públicos y la Corporación del Fondo de Interés Apremiante puedan emitir bonos y utilizar otros mecanismos de finan-ciamiento y que los municipios puedan tomar dinero a préstamo del Banco Gubernamental de Fomento. Como po-demos observar, se trata de crear estos mecanismos para allegar dinero a las arcas del Estado. Estas medidas, evi-dentemente, comprenden, entre ellas, un solo asunto. Sin embargo, en el Cap. Ill del mismo estatuto se crea una nueva ley de despidos lo cual, sin duda, constituye un asunto diferente, contrario a la disposición constitucional.
De otra parte, el título de la Ley Núm. 7 ocupa dos pá-ginas y media del texto del estatuto, que se dedican casi en su totalidad a describir en detalle todas las enmiendas so-bre medidas de ingresos y mejor fiscalización que se inclu-yeron en el Cap. II y las relacionadas a las medidas fiscales que se incorporaron en el Cap. IV. Sin embargo, la porción *155 que se refiere a las medidas de control y a la reducción de gastos operacionales y de nómina dispuestas en el Cap. III es sumamente parca y generalizada. En otras palabras, el título de la ley no informa todos los asuntos o las materias que forman parte del Cap. Ill del estatuto y no les anuncia a los legisladores y a los ciudadanos de qué trata el Cap. III.
Contrario a la descripción sumamente pormenorizada de los asuntos atendidos en los Caps. II y IV, en la porción que se refiere a las medidas de control y reducción de gas-tos operacionales y de nómina incluidas en el Cap. III, el título de la Ley Núm. 7 meramente alude
... en lo referente a la reducción de gastos, establecer un plan de tres fases para la reducción de la nómina gubernamen-tal ....
Lo anterior no describe, ni siquiera escuetamente, el contenido del Cap. III de la Ley Núm. 7. Primero, este ca-pítulo contiene más de un asunto distinto a la reducción de la nómina gubernamental. Por ejemplo, en el Cap. III se suspende el sistema de relaciones laborales en el sector público, que incluye la negociación colectiva y los convenios colectivos; se suspende la aplicación del principio de mé-rito; se limita el sistema de administración de personal, y está implícita una reorganización del gobierno central. Segundo, aun si se aceptara, para efectos del análisis, que el Cap. III trata de sólo un asunto, éste no se anuncia clara-mente en el título. En otras palabras, al leer el título de la ley, las personas o entidades afectadas no se enteran de las implicaciones de la medida.
Podría plantearse que la frase “para otros fines”, in-cluida en la legislación, resuelve el problema constitu-cional. Sin embargo, ya este Tribunal se ha expresado so-bre ese aspecto:
“Aunque términos como ‘etcétera’ y ‘para otros fines’ frecuen-temente se usan en los títulos de las leyes, tales frases tienen muy poco efecto sobre la validez de los estatutos. Aunque estos *156 términos pueden servir para advertir que materias adiciona-les a las especificadas en el titulo aparecen en la ley, tales términos no pueden convalidar la inclusión de disposiciones incongruentes .”(130)
Ante este cuadro, y dado que la ley incluye una cláusula de separabilidad,(131) lo que procede es declarar nulo el Cap. Ill y mantener la vigencia del resto del contenido de la Ley Núm. 7.
IV

Conclusión

El análisis que he expuesto en estas apresuradas pági-nas me lleva a disentir enérgicamente de la decisión a la que hoy se adhiere la mayoría del Tribunal. Veo con mucha tristeza la posición asumida por la mayoría en esta deci-sión ante asuntos tan desgarradoramente complejos para la historia de nuestro pueblo. Esta es una decisión desin-formada, resultado de un improvisado y mal aplicado pro-ceso de certificación. En ausencia de prueba, la mayoría acaba por deshacer los fundamentos metodológicos de la mejor hermenéutica constitucional y termina en el terreno de la especulación acientífica.
La Constitución es algo más que un depósito de pala-bras; es un pacto social maduro entre el Estado y los ciu-dadanos, que ha sido bordado lentamente y se ha cimen-tado en décadas de consenso. Central a este pacto está el valor que le hemos concedido al trabajo en la estructura social de nuestro país. Nuestros tribunales han avalado esta apreciación por muchas décadas. Hoy, con esta deter-minación, la mayoría de este Tribunal rompe este pacto social y abandona en el desamparo a miles de ciudadanos *157 que han perdido su modo de vida y mantiene en la insegu-ridad jurídica a los que aún conservan sus puestos.
El Cap. III de la Ley Núm. 7 elimina de un plumazo el derecho de los empleados públicos a retener sus puestos de empleo, a la vez que deroga o suspende derechos que eran parte de sus contratos de trabajo. Así, el esfuerzo humano que representa el trabajo, esa importante propiedad, que posibilita la reproducción social y la integridad de los con-tratos que la contenían, han sido tirados por la borda, junto con medio siglo de interpretación constitucional de-mocrática y de avanzada. En fin, todo lo que significa el Cap. III, desde su faz a su aplicación, es inconstitucional.
Los pactos sociales entre los diversos componentes de un pueblo no deben deshacerse sino expandirse hacia nue-vas fronteras de justicia social. El desarrollo de las socie-dades no se puede fundamentar en la desigualdad ni en la violencia institucional, aniquilando los sueños que el tra-bajo provee a los más débiles. Nuestros retos económicos no pueden ser solventados aplastando la dignidad de nuestros servidores públicos. Ante los nuevos retos, son necesarios nuevos pactos y consensos sociales. A éstos no podremos llegar cultivando la desconfianza de los ciudadanos en las instituciones.
Lamentablemente, después de esta decisión, el derecho constitucional en las escuelas de Derecho se enseñará “antes” y “después” de la Ley Núm. 7, pero no como el derecho de filiación antes y después de nuestra honrosa decisión en Ocasio v. Díaz, 88 D.P.R. 676 (1963), ni como la ley de divorcio antes y después de Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978), casos que ampliaron y fortalecieron los derechos del individuo frente al Estado. Todo lo contrario, esta decisión será estudiada como aquella que entronizó al Estado como el protagonista principal del sistema frente al ciudadano. Ante esto, yo disiento. No puedo mantener silen-cio ni ser cómplice de esta enajenada visión.
*158 — o —

 Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico.

 El Artículo 69 de la Ley Especial Declarando Estado de Emergencia Fiscal y Estableciendo Plan Integral de Estabilización Fiscal para Salvar el Crédito de Puerto Rico, Ley Núm. 7 de 9 de marzo de 2009, dispone lo siguiente:
“El Tribunal Supremo del Estado Libre Asociado de Puerto Rico expedirá un auto de certificación a solicitud de parte para traer inmediatamente ante sí y resolver cualquier asunto pendiente ante el Tribunal de Primera Instancia o ante el Tribunal de Apelaciones cuando se plantee la validez o constitucionalidad de esta Ley especial o cualquier impugnación a la misma de cualquier naturaleza.”

 Regla 23 del Reglamento del Tribunal Supremo, 4 L.RR.A. Ap. XXI-A. Véase, además, J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Pubs. J.T.S., 2000, T. II, págs. 836-838 y 890-892.

 Regla 38 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

 Según el Reglamento del Tribunal Supremo, la asignación de los casos es facultad del Juez Presidente del Tribunal y, en su defecto, del Juez Asociado de mayor antigüedad. Regla 5 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A.

 Por ejemplo, en uno de los casos consolidados (CT-2009-5), la representación legal de los empleados presentó, el 16 de noviembre de 2009, una moción de desisti-miento parcial sin perjuicio, porque la Junta de Estabilización y Reconstrucción Fiscal de Puerto Rico (J.R.E.F.) había pospuesto los despidos de un grupo de empleados. *114 Oportunamente, el Estado se opuso, porque entendió que la posposición de los des-pidos no hacía académica la controversia debido a que la determinación del Estado no tenía visos de permanencia. Estas mociones nunca fueron resueltas por este Tribunal y en la opinión mayoritaria se declara “con lugar” el desistimiento. Sin embargo, no se hizo lo mismo respecto al CT-2009-06. En este último los despidos de las demandantes también fueron pospuestos e, inexplicablemente, la mayoría no deses-timó la reclamación. Entiendo que la posición del Estado es correcta, porque se con-figuró la excepción mencionada a la doctrina de academicidad. Por consiguiente, no debió desestimarse la demanda de los empleados que lo solicitaron.

 C.A. Varela, Valoración de la Prueba, 2da ed., Buenos Aires, Ed. Astrea, 1999, pág. 53.

 íd.

 Véase R Badenes Gasset, Metodología del Derecho, Barcelona, Ed. Bosch, 1959, pág. 17.

 Varela, op. cit, pág. 86.

 M.C. Redondo, La noción de razón para la acción en el análisis jurídico, Madrid, Centro de Estudios Constitucionales, 1996, pág. 118.

 íd., págs. 230-231.

 Opinión del Tribunal, póg. 59.

 Id., pág. 50.

 íd., págs. 59-60.

 íd., pág. 61.

 íd., págs. 61-62.

 íd., pág. 15.

 íd.

 íd., págs. 48-49. En ocasiones, se pasa por alto que algunos artículos de la Ley Núm. 7 a los que la opinión hace referencia, fueron enmendados. Por ejemplo, el Artículo 37.02, que en su versión enmendada excluye de su aplicación a numerosos *120 empleados, además de los mencionados en el esc. 13, pág. 21 de la opinión, según la Ley Núm. 37 de 10 de julio de 2009. Por otro lado, se menciona en el texto de la opinión el Artículo 40 de la Ley Núm. 7 para establecer que éste dispone que “los convenios colectivos expirados a la fecha de vigencia de la ley o que expiren durante la vigencia de ésta, no podrán ser extendidos ni negociados” y que “[e]sta prohibición se extenderá por un término de dos años, a partir de la vigencia de la propia ley”. Id., pág. 31. Este artículo también fue enmendado por la Ley Núm. 37 de 2009, a los efectos de extender los convenios colectivos vencidos, o que vencieran durante la vigencia de la Ley Núm. 7, hasta el 9 de marzo del 2011 y prohibir la organización sindical durante ese mismo periodo. No hay duda de que estos errores son producto de la prisa en decidir el recurso.

 La controversia de este caso era si la Ley Núm. 96 de 7 de agosto de 2001 (Ley Núm. 96), que autorizó el cobro por servicio a los empleados que optaran por no afiliarse a la organización sindical, se debía aplicar retroactivamente a estos traba-jadores que no se afiliaron cuando estaba vigente la Sección 4.2 de la Ley Núm. 45 de 25 de febrero de 1998 (Ley Núm. 45), conocida como Ley de Relaciones del Trabajo para el Servicio Público de Puerto Rico, 3 L.P.R.A. sec. 1451c (ed. 2000), y que por ejercer tal derecho no tenían que pagar los cargos por servicios. Concluí que no constituía un derecho adquirido el que la Ley Núm. 45 eximiera del pago de cargos por servicios a los empleados que no se afiliaron a la unión antes de la aprobación de la Ley Núm. 96, máxime cuando esos empleados también disfrutan de los beneficios que se pueden obtener mediante la negociación colectiva. Por lo tanto, se podía apli-car retroactivamente la Ley Núm. 96 de 2001 a estos trabajadores.

 Art. II, Sec. 18, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008.

 3 Diario de Sesiones de la Convención Constituyente 2265 (1952). Véase, además, A.A.A v. Unión Empleados A.A.A., 105 D.P.R. 437, 452-454 (1976).

 Diario de Sesiones, supra, pág. 2266.

 Sánchez et al. v. Srio. de Justicia et al., 157 D.P.R. 360, 387 (2002); E.L.A. v. Aguayo, 596, citando Ashwander v. Valley Authority, 297 U.S. 288, 346 (1936).

 Sánchez et al. v. Srio. de Justicia et al., supra, pág. 387; E.L.A. v. Aguayo, supra, pág. 596. Véanse: Sánchez et al. v. Srio. de Justicia et al., supra; Rescue Army v. Municipal Court, 331 U.S. 549, 575 (1946); Brotherhood of Teamsters v. Denver Milk Producers, 334 U.S. 809 (1948); Parker v. Los Angeles, 338 U.S. 327, 329 (1949).

 Cabe señalar que la Regla 5 del Reglamento permite acortar los términos. 4 L.P.R.A. Ap. XXI-A, R. 23.

 Distinto a la última vez en que se acortaron los términos, al decidir los casos de Suárez v. C.E.E. I, 163 D.P.R. 347 (2004), y Suárez v. C.E.E. II, 163 D.P.R. 374 (2004), cuando urgía resolver el caso para que se pudiera certificar al gobernador que prevaleció en las elecciones generales y que juramentaría su cargo en poco más de un mes. En aquella ocasión, al igual que ahora, se trataba de una controversia de alto interés público. Sin embargo, la controversia planteada en Suárez era solamente de Derecho y no de hechos. Además, en Suárez la Comisión Estatal de Elecciones era parte en el caso. También, este caso trataba sobre el derecho fundamental al voto que le otorga nuestra Constitución a todos los puertorriqueños y, por consiguiente, era este Tribunal el llamado a entender inicialmente en esta controversia. Por último, al dictar la sentencia per curiam de Suárez tuvimos el beneficio de una decisión que el tribunal de instancia había tomado en corte abierta.

 En un periodo de 103 años se han aprobado 5 leyes de personal hasta llegar al estatuto que la Ley Núm. 7 pretende suspender, la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley Núm. 184 de 3 de agosto de 2004 (Ley Núm. 184), 2004 (Parte 1) Leyes de Puerto Rico 1122 (3 L.P.R.A. sec. 1462(e)(9)(a)). Véase, además, D. Fernández Qui-ñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Bogotá, Ed. Forum, 2001, págs. 375-376.

 See. 6.6 de la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Leyes de Puerto Rico de 2004, supra, págs. 1159-1160; 3 L.P.R.A. ant. see. 1350 (1992 y Supl. 1999). Véanse, además: Fernández Quiñones, op. cit., págs. 388-389; M.A. Velázquez Rivera, Dere-cho Administrativo, 70 Rev. Jur. U.P.R. 271, 279 (2001).
Otra forma de adquirir un interés propietario sobre un puesto, que no sea a través de un estatuto, es cuando las circunstancias del empleo crean una expectativa razonable de continuidad de manera que el trabajador tiene una reclamación legí-tima, no unilateral, de titularidad sobre el beneficio. S.L.G. Giovanetti v. E.L.A., 161 D.P.R. 492, 506 (2004); Lebrón Bonilla v. E.L.A., 155 D.P.R. 475, 489-490 (2001); Orta v. Padilla Ayala, 131 D.P.R. 227, 241 (1992); Pierson Muller I v. Feijoó, 106 D.P.R. 838, 846 (1978); Lupiáñez v. Srio. de Instrucción, 105 D.P.R. 696, 700-701 (1977). Sobre el concepto jurídico “expectativa razonable de continuidad”, como mo-dalidad de interés propietario, el Tribunal Supremo Federal ha establecido la norma de que no es necesario tener un contrato escrito, o una permanencia fundamentada en un estatuto, para tener un interés propietario sobre el puesto. Ese derecho pro-pietario puede ser el resultado de un contrato implícito. No obstante, debe existir un reclamo legítimo de titularidad y no una mera expectativa unilateral a mantenerse en el puesto. Board of Regents v. Roth, 408 U.S. 564, 577 (1972); Perry v. Sindermann, 408 U.S. 593, 601 (1972). Véase D. Fernández Quiñones, op. cit., pág. 528.

 Camacho Torres v. AAFET, 168 D.P.R. 66, 81 (2006); S.L.G. Giovanetti v. E.L.A., supra, pág. 507.

 Orta v. Padilla, supra, pág. 241; Torres Solano v. P.R.T.C., 127 D.P.R. 499, 520, 523 (1990).

 Opinión del Tribunal, pág. 68.

 Hernández, Romero v. Pol. de P.R., 177 D.P.R. 121, 147 (2009). Véase Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101, 109 (2006).

 M. Albaladejo, Derecho Civil, lima ed., Barcelona, Ed. Bosch, 1989, T. 1, Vol. I, pág. 204.

 Consejo Titulares v. Williams Hospitality, supra, pág. 109.

 J.M. Suárez Collía, El principio de la irretroactividad de las normas jurídi-cas, 2da ed., Madrid, Ed. Actas, 1994, pág. 55. Véase, además, L. Diez-Picazo y A. Gullón Ballesteros, Sistema de Derecho Civil, 9na ed., Madrid, Ed. Tecnos, 1997, Vol. I, pág. 108; J. Castán Tobeñas, Derecho Civil español, común y foral, 12ma ed., Madrid, Ed. Reus, 1982, T. I, Vol. I, pág. 616.

 J. Santos Briz y otros, Tratado de Derecho Civil: teoría y práctica, Barcelona, Ed. Bosch, 2004, T. 1, pág. 294. Véanse, además: Hernández, Romero v. Pol. de P.R., supra; Consejo Titulares v. Williams Hospitality, supra, pág. 109 (donde se hace referencia a esta misma cita).

 Santos Briz, op. cit., pág. 294.

 El análisis que se hace en esta sección de la opinión también aplica a los convenios colectivos. Los miembros de un sindicato tienen un interés propietario, o derecho adquirido, sobre sus puestos como resultado dual de su contrato de trabajo individual y del convenio colectivo.

 Velázquez Rivera, supra, pág. 279. Algunos ejemplos de la jurisprudencia que ha reconocido derechos adquiridos de los trabajadores y retirados del servicio público son: Rodríguez v. Retiro, 159 D.RR. 467, 475 (2003); Lebrón Bonilla v. E.L.A., supra, pág. 490; Sucn. Álvarez v. Srio. de Justicia, 150 D.P.R. 252, 285 (2000); Rodríguez v. Aut. de Tel. de P.R., 145 D.P.R. 595, 599 (1998).

Art. 3 del Código Civil, 31 L.P.R.A. see. 3.

 Suárez Collia, op. cit., pág. 10.

 Vázquez v. Morales, 114 D.P.R. 822, 826 (1983), citando a M. Albaladejo, Comentarios al Código Civil y compilaciones forales, Madrid, Ed. EDERSA, 1978, T. I, pág. 75. Véase, además, Suárez Collia, op. cit., págs. 42-57.

 Vázquez v. Morales, supra, pág. 826, citando a F. Puig Peña, Compendio de Derecho Civil español, 3ra ed., Madrid, Ed. Pirámide, 1976, T. I, pág. 125.

 íd.

 Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 386 (1973).

 Consejo Titulares v. Williams Hospitality, supra, pág. 168; Rodríguez v. Retiro, supra, 476; Nieves Cruz v. U.P.R., 151 D.P.R. 150, 158-159 (2000); Vélez Reboyras v. Srio. de Justicia, supra, pág. 542; Warner v. Tribunal Superior, supra, pág. 386.

 Asociación Maestros v. Educación, supra; Vargas v. Retiro, 159 D.P.R. 248, 263-264 (2003).

 Consejo Titulares v. Williams Hospitality, supra, págs. 108-109.

 Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 296.

 Art. I, Sec. 10, Const. E.E. U.U., U.S.C.A. Const.; L.P.R.A., Tomo 1.

 J. Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. U.P.R., 1982, Vol. III, págs. 187; R. Serrano Geyls, Derecho constitucional de Estados Unidos y Puerto Rico, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 858-859.

 Serrano Geyls, op. cit., págs. 858-859.

 Warner Lambert Co. v. Tribunal Superior, supra, pág. 395. Similar finalidad tenía la cláusula homologa en la Constitución federal:
“In the construction of the contract clause, the debates in the Constitutional Convention are of little aid. But the reasons which led to the adoption of the clause, and of the other prohibitions of Section 10 of Article I, are not left in doubt .... The widespread distress following the revolutionary period, and the plight of debtors, had called forth in the States an ignoble array of legislative schemes for the defeat of creditors and the invasion of contractual obligations. Legislative interferences had been so numerous and extreme that the confidence essential to prosperous trade had been undermined and the utter destruction of credit was threatened .... It was necessary to interpose the restraining power of a central authority in order to secure the foundations even of ‘private faith.’ ” (Escolio omitido.) Home Bldg. & L. Assn. Blaisdell, 290 U.S. 398, 427 (1937).

 Véanse: Beer Co. v. Massachusetts, 97 U.S. 25 (1877); Louisville Gas Co. v. Citizen’s Gas Co., 115 U.S. 685 (1883); Pennsylvania Hospital v. Philadelphia, 245 U.S. 20 (1917); Treigle v. Acme Homestead Ass’n., 297 U.S. 189 (1936).

 United States Trust Co. v. New Jersey, 431 U.S. 1, 21 (1977); Home Building & Loan Assn. Blaisdell, supra, pág. 439.

 Bayrón Toro v. Serra, 119 D.P.R. 605, 619 (1987); United States Trust Co. v. New Jersey, supra, pág. 16; El Paso v. Simmons., 379 U.S. 497, 506-507 (1965).

 Bayrón Toro v. Serra, supra.

 Emp. Pur. Des., Inc. v. H.I.E.T.E.L., 150 D.P.R. 924, 948 (2000).

 Bayrón Toro v. Serra, supra, pág. 620; United States Trust Co. v. New Jersey, supra, pág. 17.

 Energy Reserves Group v. Kansas Power & Light Co., 459 U.S. 400, 411 (1983); Warner Lambert Co. v. Tribunal Superior, supra, pág. 401.

 United States Trust Co. v. New Jersey, supra, pág. 22; Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 247, 249 (1978).

 Bayrón Toro v. Serra, supra, pág. 620; Warner Lambert Co. v. Tribunal Superior, supra, pág. 395.

 East New York Bank v. Hahn., 326 U.S. 230, 232 (1945), citado en United States Trust Co. v. New Jersey, supra, págs. 22-23.

 Warner Lambert Co. v. Tribunal Superior, supra, pág. 395.

 Este análisis es similar al escrutinio intermedio utilizado en la jurispruden-cia federal para clasificaciones semisospeehosas, como lo es discrimen por género. Véase Craig v. Boren, 429 U.S. 190 (1976).

 Bayrón Toro v. Serra, supra, pág. 620; United States Trust Co. v. New Jersey, supra, págs. 25-26.

 Energy Reserves Group v. Kansas Power & Light, supra, pág. 411; Allied Structural Steel Co. v. Spannaus, supra, pág. 261.

 Bayrón Toro v. Serra, supra, pág. 621; United States Trust Co. v. New Jersey, supra, pág. 21.

 United States Trust Co. v. New Jersey, supra, pág. 26.

 Bayrón Toro v. Serra, supra, pág. 620.

 Warner Lambert Co. v. Tribunal Superior, supra, pág. 396.

 United States Trust Co. v. New Jersey, supra, págs. 15 y 23.

 United States Trust Co. v. New Jersey, supra, págs. 29-31.

 Energy Reserves Group v. Kansas Power & Light, supra, págs. 412-413; United States Trust Co. v. New Jersey, supra, pág. 26.

 Warner Lambert Co. v. Tribunal Superior, supra, pág. 398.

 United States Trust Co. v. New Jersey, supra, pág. 22.

 “Yet the Contract Clause limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation.” United States Trust Co. v. New Jersey, supra, pág. 21. Véase Home Bldg. & L. Assn. Blaisdell, supra, pág. 439.

 G. Caballerías de Torres, Diccionario de Derecho Laboral, Buenos Aires, Ed. Heliasta S.R.L., 2001, págs. 139-140. Véase, además, Soc. de Gananciales v. Vélez & Asoc., 145 D.P.R. 508, 517 (1998).

 Arts. 37.04(b) y 46 de la Ley Núm. 7.

 Art. 37.04 de la Ley Núm. 7.

 Art. 37.04(a)(2),(5),(6),(8),(9),(10) y (11) de la Ley Núm. 7. El impacto de este artículo, en términos de la legislación laboral, es sumamente amplio, porque dispone que “se suspenderá toda cláusula, precepto y/o disposición aplicable a los empleados y/o puestos sujetos a las disposiciones de este Capítulo III, contenidas en las leyes, convenios colectivos”. (Enfasis suplido.) En cuanto al término “precepto”, esta misma ley lo define, en su Artículo 33, como:
“ ‘Precepto’ significa leyes, artículo o sección de ley; convenio colectivo o dispo-siciones contenidas en convenios colectivos, acuerdos, acuerdos suplementarios, po-líticas, manuales de empleo, cartas circulares, cartas contractuales, certificaciones, addenda, reglamentos, reglas y condiciones de empleo, cartas normativas, planes de clasificación y/o planes de retribución.” (Enfasis suplido.) Art. 33(k) de la Ley Núm. 7.
Para ver un ejemplo concreto del impacto que tiene la Ley Núm. 7, detallamos algunas de las secciones del Convenio Colectivo Departamento de la Familia y Ser-vidores Públicos Unidos de Puerto Rico, Unidad A, 2007-2010, que han quedado suspendidas: Artículo II: Declaración de Principios; Artículo III: Exposición de Moti-vos; Artículo VII: Mantenimiento de las Condiciones de Empleo; Artículo VIII: Sub-contratación; Artículo IX: Acuerdo de no discrimen; Artículo XII: Procedimiento de Quejas y Agravios; Artículo XIX: Clasificación y Retribución de Puestos; Artículo XX: Reclutamiento y Selección; Artículo XXII: Ascensos; Artículo XXIV: Traslados; Artí-culo XXVII: Cesantías. Convenio Colectivo Departamento de la Familia y Servidores Públicos Unidos de Puerto Rico, Unidad A, 2007-2010, Autos de Instancia CT-2009-6, Anejo 4, págs. 5-6, 9-10, 12-16, 22-24, 26 y 28-33.

 Sección 44 de la Ley Núm. 37 que enmienda el Artículo 40 de la Ley Núm. 7.

 Arts. 37.04b(13)(14) y 46a y b de la Ley Núm. 7.

 Art. 38.02a(16) de la Ley Núm. 7.

 Art. 38.02a(16) de la Ley Núm. 7.

 Exposición de Motivos de la Ley Núm. 7, pág. 3.

 Véanse, por ejemplo: J.E. Rivera Santana, Análisis de la situación econó-mica fiscal, Sindicato Puertorriqueño de Trabajadores (SPT), 2009; presentación: Ante la Crisis Presupuestaria, Central Puertorriqueña de Trabajadores, 2 de enero de 2009; presentación: Propuestas sector sindical: medidas ante la crisis fiscal, 7 de enero de 2009; Propuesta al Departamento de Educación, Sindicato Puertorriqueño de Trabajadores — Local 1996, febrero de 2007; Nuevo Modelo Organizativo para la Rama Ejecutiva: Proyecto de Reforma Gubernamental, Escuela Graduada de Admi-nistración Pública de la Universidad de Puerto Rico, julio de 2009; Sindicatos 2009. Estrategias frente a la crisis mundial, él multilateralismo y los acuerdos comerciales y de inversión, Brasil, Museo Amano, 2009. http://www.ituc-csi.org/sindicatos-2009-estategias-frente.html?lang=en

 Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 871 (2do Cir. 2006),

 Baltimore Tchrs. Un. v. Mayor, etc., of Baltimore, 6 F.3d 1012, 1020—1021 (4to Cir. 1993).

 Garriga Villanueva v. Mun. de San Juan, 176 D.P.R. 182 (2009); Fernández Quiñones, op. cit, pág. 375.

 Lupiáñez v. Srio. de Instrucción, 105 D.P.R. 696, 701 (1977).

 Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 296. Esta cláusula tiene su homologa en la Constitución de Estados Unidos, específicamente en las Enmiendas V y XIV.

 2 Diario de Sesiones, supra, pág. 1104.

 López y otros v. Asoc. de Taxis de Cayey, 142 D.P.R. 109, 113 (1996).

 Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 D.P.R. 881, 888 (1993).

 Bd. Regents v. Roth, supra, pág. 576; J.J. Álvarez González, Derecho cons-titucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, pág. 608.

 Garriga Villanueva v. Mun. San Juan, supra; Almonte et al. v. Brito, 156 D.P.R. 475, 481 (2002); U. Ind. Emp. A.E.P. v. A.E.P., 146 D.P.R. 611, 616 (1998).

 Hernández v. Secretario, 164 D.P.R. 390, 394-395 (2005); McConell v. Paláu, 161 D.P.R. 734, 757-758 (2004); Rivera Rodríguez & Co. v. Lee Stowell, etc., supra, pág. 887; Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265, 273-274 (1987).

 Fernández Quiñones, op. cit., pág. 315.

 Rivera Rodríguez & Co. v. Lee Stowell, etc., supra, págs. 888-899; Morales Narváez v. Gobernador, 112 D.P.R. 761, 766-768 (1982); Vélez Ramírez v. Romero Barceló, 112 D.P.R. 716, 730-731 (1982); Lupiáñez v. Srio. de Instrucción, supra, pág. 700-701; Álvarez González, op. cit, pág. 591; Fernández Quiñones, op. cit., pág. 317.

 Rivera Santiago v. Srio. de Hacienda, supra, pág. 273-274; Fernández Quiñones, op. cit., pág. 316.

 Fernández Quiñones, op. cit., pág. 317.

 Almonte et al. v. Brito, supra, pág. 481; P.A.C. v. E.L.A. I, 150 D.P.R. 359, 376 (2000); Fac. C. Soc. Aplicadas, Inc. v. C.E.S., 133 D.P.R. 521, 542 (1993); Domínguez Talavera v. Tribunal Superior, 102 D.P.R. 423, 428 (1974).

 Rivera Rodríguez & Co. v. Lee Stowell, etc., supra, págs. 888-889; P.A.C. v. E.L.A. I, supra, pág. 376; Vélez Ramírez v. Romero Barceló, supra, págs. 723-724; Mathews v. Eldridge, 424 U.S. 319, 334-335 (1976).

 Almonte et al. v. Brito, supra, pág. 482; Rivera Rodríguez & Co. v. Lee Stowell, etc., supra, págs. 888-889; Rivera Santiago v. Srio. de Hacienda, supra, págs. 277 — 278; Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985).

 A.E.E. v. U.T.I.E.R., 153 D.P.R. 623, 630 (2000); U. Ind. Emp. A.E.P. v. A.E.P., supra, pág. 617; Marrero Caratini v. Rodríguez Rodríguez, 138 D.P.R. 215, 220 (1995); Torres Solano v. P.R.T.C., supra, pág. 520.

 Garriga Villanueva v. Mun. San Juan, supra; Torres Solano v. P.R.T.C., supra, págs. 520-521 y 523. Véase, además, U. Ind. Emp. A.E.P. v. A.E.P, supra.

 U. Ind. Emp. A.E.P. v. A.E.P., supra, pág. 622.

 Olivieri Morales v. Pierluisi, 113 D.P.R. 790, 796 (1983); Pizarro v. Municipio de Carolina, 112 D.P.R. 822, 828-829 (1982).

 Calzada Quiñones v. D.A.C.O., 114 D.P.R. 757, 760 (1983).

 Olivieri Morales v. Pierluisi, supra, pág. 796.

 Opinión del Tribunal, pág. 63.

 íd.

 íd.

 Art. 6, Sec. 6.6(9)(a) de la Ley Núm. 184 de 2004 (3 L.P.R.A. see. 1462e(9)(a)).

 Autos de Instancia CT-2009-6, Anejo 6.

 Opinión del Tribunal, pág. 64.

 Art. Ill, Sec. 17, Const. E.L.A., supra, pág. 327.

 ei precepto contenía el mandato siguiente:
“No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título; pero si algún asunto que no esté expresado en el título fuere incluido en cualquier ley, esa ley será nula solamente en aquella parte de ella que no haya sido expresada en su título.” See. 34 del Acta Jones, Carta Orgánica de 1917, L.P.R.A., Tomo 1, ed. 2008, pág. 105.
La Carta Orgánica de 12 de abril de 1900, conocida como la Ley Foraker, no incluyó esta prohibición. R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpre-tación de las Leyes de Puerto Rico, 2da ed., San Juan, Pubs. JTS, 1987, pág. 79. Véase, además, Trías Monge, op. cit., págs. 159-160.

 Dorante v. Wrangler of P.R., 145 D.P.R. 408, 428 (1998); Cervecería Corona, Inc. v. J.S.M., 98 D.P.R. 801, 812 (1970); Pueblo v. Vázquez Bruno, 93 D.P.R. 540, 542-543 (1966); Pueblo v. Díaz Torres, 89 D.P.R. 720, 724-725 (1963); Rodríguez v. P.R. Ry., R. & Power Co., 30 D.P.R. 931, 932 (1922).

 Laboy v. Corp. Azucarera Saurí & Subirá, 65 D.P.R. 422, 426 (1945); Rodríguez v. Corte, 60 D.P.R. 919, 922 (1942); Pueblo v. Arocho, 34 D.P.R. 847, 855-856 (1926).

 Pueblo v. Vázquez Bruno, 93 D.P.R. 540, 542-543 (1966); Pueblo v. Díaz Torres, 89 D.P.R. 720, 724-725 (1963).

 Dorante v. Wrangler of P.R., supra, pág. 428; Cervecería Corona, Inc. v. J.S.M., supra, pág. 812; Laboy v. Sauri, supra, pág. 426, citando el caso Posados v. Warner, B. & Co., 279 U.S. 340 (1929); Rodríguez v. Corte, supra, pág. 922.

 Dorante v. Wrangler of P.R., supra, pág. 428; Laboy v. Corp. Azucarera Saurí & Subirá, pág. 426, citando el caso Posados v. Warner, B. & Co., supra; Rodríguez v. Corte, supra, pág. 922.

 Dorante v. Wrangler of P.R., supra, pág. 428. Véanse: Laboy v. Corp. Azucarera Saurí & Subirá, supra, pág. 425; Rodríguez v. Corte, supra, págs. 922-923.

 Cervecería Corona, Inc. v. supra, pág. 812.

 A esos efectos, se consignaron las expresiones siguientes:
“Sr. Negrón López: ... Esta oración ‘no se aprobará ningún proyecto de ley con excepción de los de presupuesto general que contenga más de un asunto, el cual deberá ser claramente expresado en su título’ es una disposición encaminada a evitar los riders, a evitar que se hagan enmiendas extrañas al propósito de los proyectos y que se adultere el fin de un proyecto aprobando subrepticiamente algo que la Asam-blea Legislativa no dejaba aprobar, no debió haber permitido que se aprobara de haber conocido la intención.” 2 Diario de Sesiones, supra, pág. 896.
“Las disposiciones sobre título y asunto “impiden prácticas fraudulentas, facili-tan la labor legislativa y hacen imposible que grupos minoritarios incorporen sus proposiciones favoritas en una sola pieza de legislación y se unan para obtener una mayoría artificial, la cual no existiría si las distintas proposiciones se consideraran separadamente”. 4 Diario de Sesiones, supra, pág. 2584.

 Laboy v. Corp. Azucarera Saurí & Subirá, supra, pág. 428.

 Art. 71 de la Ley Núm. 7.